Nancy Naragon, (Naragon) administratrix for the estate of her deceased husband, Timothy Naragon (Tim), appeals from judgment of dismissal entered in the Shelby County Court of Common Pleas. Summary judgment was granted in favor of all three defendants: Dayton Power Light Co. (DPL), Henkels McCoy, Inc. (HM) and American Line Builders Joint Apprenticeship Training Committee (ALBAT). Naragon's motion for summary judgment against all three defendants was denied.
This action stems from Timothy Naragon's death on November 9, 1993 while working on above ground power lines in Shelby County, Ohio. Tim, employed by HM as a sixth step apprentice linesman, was electrocuted while performing distribution line maintenance on power lines owned by DPL.
On the day of the incident, Karl Matilla (Karl), Tim's foreman, Tim and Mark Cameron, the groundsman, were assigned by HM to replace lightning arresters[1] and cutouts[2]
affixed to the first utility pole south of State Route 274 in Jackson Center. Karl and Tim went aloft in the three by four foot insulated bucket. Tim was positioned near the partially energized phase cutouts and Karl was positioned closest to the bucket controls, to the side and rear of Tim. Starting with the first of the three phases, the A phase, the two men worked west and affixed insulated rubber blankets and hoses to exposed parts of phases, A, B and C respectively. Karl and Tim first installed replacement parts on the C phase. The bucket was then moved between the C and B phase as the men replaced equipment on the B phase.
Upon finishing the B phase installation, Karl states that the B phase was recovered with a rubber blanket. Karl then asked Tim if he was "in the clear,"as Karl intended to remove the protective blanket and hose from the C phase. Karl states further that his back was to Tim, but he heard Tim say "Okay" in response to his question. Karl then began to remove the blanket from the C phase when he heard a roar behind him. Karl turned and saw Tim on fire, slumped over in the bottom of the bucket.
Tim's chest and chin came in contact with the B phase cutout allowing 7,200 volts of electricity to enter his body. Tim's injuries were fatal. Karl could offer no explanation as to how Tim came in contact with the cutout. After the incident, the protective blanket originally clamped around the B phase cutout was observed only partially covering the cutout, exposed to where Tim was standing. There is no evidence in the record, however, indicating that Karl or any other HM employee observed the B phase cutout exposed to Tim immediately prior to the incident.
A few months prior to his electrocution Tim was credited with 5,000 hours of experience from the ALBAT training program which certified Tim as a sixth step apprentice, competent to perform energized line work while under supervision. Though Tim had worked in the utilities construction business for well over 20 years, he had primarily been a groundsman, truck driver and a transmission linesman, working on only de-energized lines. Distribution line work requires work on energized lines. An ALBAT representative, Wally Sickles, testified at his deposition that Tim's prior above ground de-energized line work was the primary reason he was credited with 5,000 hours experience. Sickles explained that Tim had to know his way around energized lines to work on de- energized lines.
Another ALBAT representative was deposed by the Appellant, regional Director, Alfred Pelletier. Pelletier stated that Tim's 5,000 hours were credited based on two factors 1) Tim's experience and 2) ALBAT's concern that Tim would be hurt economically if placed in a lower apprenticeship slot. Tim worked energized lines for only about three months prior to his death and had not yet begun his ALBAT energized line training classes, which were scheduled to start the week after his death.
Naragon asserts three assignments of error.
 I. THE TRIAL COURT ERRED BY REFUSING TO ALLOW ADEQUATE ANDUNENCUMBERED DISCOVERY.
 II. THE TRIAL COURT ERRED WHEN IT GRANTED APPELLEES' MOTIONS FOR SUMMARY JUDGMENT BECAUSE THERE EXISTS, AT THE VERY LEAST, GENUINE ISSUES OF MATERIAL FACT.
 III. THE TRIAL COURT ERRED BY MISAPPLYING THE LAW OF INTENTIONAL EMPLOYMENT TORTS AND EMPLOYER DUTIES.
 I.
Naragon's first assignment claims the "trial court erred by refusing to allow adequate and unencumbered discovery." Naragon claims her discovery was encumbered because counsel for DPL improperly demanded payment for their discovery costs citing an order from a previously dismissed federal case. Naragon contends that absent such demands from DPL, she could have conducted necessary depositions. Naragon's argument is not well taken.
The civil rules do not require permission be obtained from the opposing party or counsel before a deposition may be conducted. To the contrary, "[a]fter commencement of the action, any party may take the testimony of any person, including a party, by deposition." Civ. R. 30(A). Further, the appearance of the opposing party or witness may be compelled either through a subpoena or proper notice. Civ. R. 30(A). While agreed discovery and the courtesy of counsel are encouraged, the Civil Rules provide relief for delay caused by recalcitrant witnesses and counsel. The record discloses no attempts by Naragon to use the rules to get needed discovery.
Naragon claims the trial court erred when it denied her request for a second 90 day continuance to complete discovery. The trial court ruled that Naragon had been afforded sufficient time for discovery and noted that "extensive discovery was conducted in the federal action." Citing Civ. R. 56(F), Naragon claims that a party opposing a motion for summary judgment shall be liberally afforded time to complete discovery. While Civ. R. 56(F) does permit a continuance for additional discovery, a request therefore must be proper. Civil Rule 56(F) provides:
 Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just. (emphasis added).
Civ. R. 56(F).
To avail oneself to a Civ. R. 56(F) continuance, the adverse party must file an affidavit stating sufficient reasons why they are unable to present facts essential to establish opposition to a motion for summary judgment. Grange Mut. Cas. Co. v. State Auto.Mut. Ins. Co. (1983), 13 Ohio App.3d 217, 468 N.E.2d 909; andClose v. Ebersole (May 29, 1990), Logan App. No. 8-89-1, unreported. Here, Naragon filed no such affidavit. Without an explanation as to why Naragon was unable to present facts in opposition to the defendants' motions for summary judgment, the motions were properly before the trial court for decision. Civ. R. 56(F); and Gates Mills Investment Co. v. Pepper Pike (1978),59 Ohio App.2d 155, 392 N.E.2d 1316.
Upon reviewing all the material before the trial court, we find the court did not abuse its discretion by denying Naragon's request for a second 90 day continuance. Feichtner v. Cleveland
(1994), 95 Ohio App.3d 388, 642 N.E.2d 657; Whiteleather v.Yosowitz (1983), 10 Ohio App.3d 272, 461 N.E.2d 1331. In light of Naragon's failure to conduct or explain her failure to conduct depositions during the initial 90 day continuance afforded to her, together with the absence of any evidence the trial court refused to consider her request on its merits, we find the trial court's decision was well within its discretion. Whiteleather, 10 Ohio App.3d 272,461 N.E.2d 1331.
Naragon's first assignment of error is overruled.
 II.
In Naragon's second assignment she claims the "trial court erred when it granted Appellees' motions for summary judgment because there exists, at the very least, genuine issues of material fact."
Pursuant to Ohio Civ. R. 56(C), summary judgment is available when the movant establishes the following: 1) that there is no genuine issue as to any material fact; 2) that the moving party is entitled to judgment as a matter of law; and 3) that reasonable minds can come to but one conclusion, and when viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. Bostic v. Connor
(1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881. When reviewing a ruling on a motion for summary judgment, an independent review is undertaken by the Appellate court. Midwest Specialties, Inc. v.Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6,536 N.E.2d 411, cause dismissed, 39 Ohio St.3d 710, 534 N.E.2d 94. Further, if
 the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ. R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 145,677 N.E.2d 308, 317, recons. denied, 79 Ohio St.3d 1422,680 N.E.2d 158, quoting Dresher v. Burt (1996), 75 Ohio St.3d 280,295, 662 N.E.2d 264, 275.
A. Dayton Power Light, Co.
Naragon asserts that issues of material fact exist as to the liability of DPL. Naragon argues DPL had a duty to either warn the HM crew of grounding violations or had a duty to de-energize the power line on which Tim was working.
Even if we were to assume grounding by another HM crew proximately caused Tim's death, the contract entered into between HM and DPL through its project manager, Fluor Daniel, Inc.,[3] cannot be interpreted to create a duty upon DPL to warn HM employees of potential safety hazards. It was the duty of HM to ensure safety of its workers.
The contract between HM and Fluor Daniel states in Part I:
 13.1.2 Contractor's Safety Representative shall be responsible for initiating the safety program, ensuring that jobsite safety requirements and procedures are being accomplished, conducting safety inspections of Work being performed, conducting weekly safety meetings with craft employees and submitting a weekly report to Fluor Daniel documenting safety activities * * *
Also stated in Part I:
 13.1.3 Fluor Daniel and Owner [DPL] shall have the right to stop Work whenever safety violations are observed which could jeopardize the well being of personnel and equipment * * * The failure or refusal of contractor to correct the observed violation may result in the termination of the Contract, and/or the dismissal from the jobsite of those responsible for such failure or refusal. (emphasis added).
At best, DPL inspectors had the right, but not the duty, to observe safety violations. DPL's failure to exercise this right could only prevent the exercise of other contractual rights, like terminating the contract in its entirety. As DPL did not expressly assume a duty to act under the contract, the contract cannot serve as a basis to impose a duty upon DPL to protect HM employees.
Naragon also argues DPL had a duty to de-energize the lines upon which Tim was working. Naragon filed affidavits of three engineering experts, Larry Murphy, Samuel Sero and Ingo Zeise. All Naragon's experts maintain that it would have been fairly easy and much safer had DPL permitted the crew to de- energize the B phase, the only phase carrying electricity, prior to working on the pole. De-energizing the line, the experts maintain, could have been done without interruption of service to any DPL customers.
While it may be argued that de-energizing the 7,200 volt line which electrocuted Tim was a safer way to perform the job, the agreement between HM and DPL is clear that the parties agreed work was to be performed on energized line. In Part I, ¶ 1.0 of the contract HM agreed to work "[a]ll voltages 12KV[4] and under . . . while energized." Further, only "circuits operating at 34KV and above" were eligible for an "electrical outage . . . when system loads and other conditions permit." Accordingly, the 7,200 volt line with which Tim came in contact carried well under the 34KVs contemplated between the parties as high enough voltage to necessitate de-energized work.
Further, Naragon fails to point to any evidence demonstrating DPL otherwise assumed a duty for her husband's safety at the work site. It is undisputed that Ed Sensenbaugh, a DPL inspector, was at the job site one-half hour prior to the incident. DPL maintains, however, that Sensenbaugh was merely observing the work to ensure "quality and timeliness" and "[w]ould not check on safety." A review of the actual work relationship, however, is necessary to determine if any evidence was presented which could demonstrate a duty was otherwise assumed.
DPL was the owner of the power lines. Tim worked for HM, an independent contractor hired by Fluor Daniel, the project manager for DPL. Even if DPL were acting as a general contractor based on the presence of its employee Sensenbaugh, its duty to Tim would be limited. "[W]here an independent contractor undertakes to do work for another in the very doing of which there are elements of danger, no liability ordinarily attaches" to the general contractor. Wellman v. E. Ohio Gas Co. (1953), 160 Ohio St. 103,113 N.E.2d 629.
Though Naragon does not dispute Tim's work was dangerous, she notes an exception to Wellman's dangerous work doctrine has been made where a general contractor "actually participates in the job operation . . . and fails to eliminate a hazard which he, in the exercise of ordinary care, could have eliminated." Hirschbach v.Cincinnati Gas Elec. Co. (1983), 6 Ohio St.3d 206, 207,452 N.E.2d 326. This exception was modified somewhat in Cafferkey v.Turner Constr. Co. (1986), 21 Ohio St.3d 110,113, 488 N.E.2d 189,192, where Justice Wright explained that a general contractor may only be liable for an independent contractor's injury if the general contractor "actively participate[s]" in the work and has "control over the means or manner" of the work. (emphasis added). This more rigorous test was reaffirmed in Bond v. Howard Corp.
(1995), 72 Ohio St.3d 332, 650 N.E.2d 416.
Here, nothing in the record could be interpreted as indicating DPL actively participated in the manner and mode of the work performed by HM employees. First, the contract in Part III, ¶ 34.0 states:
INDEPENDENT CONTRACTOR
 Nothing in this Contract shall be deemed to represent that Contractor, or any of Contractor's employees or agents are the agents, representatives or employees of Fluor Daniel or Owner. Contractor shall be an Independent Contractor and shall have responsibility for and control over the details and means for performing the Work, provided that Contractor is in compliance with the terms of this Contract. Anything in this Contract which may appear to give Fluor Daniel or Owner the right to direct Contractor as to the details of the performance of the Work or to exercise a measure of control over Contractor, shall mean that Contractor shall follow the desires of Fluor Daniel or Owner only as to the intended results of the Work.
Further, the actions of the DPL inspector at the job site, merely being present and observing, is not enough to create a duty upon DPL to have acted in some way to prevent Tim's injury.Cafferkey, 21 Ohio St.3d 110, 488 N.E.2d 189. Sensenbaugh must have "actively participated" in the work at this job site for DPL to have had a duty to Tim. Id. at 113 . The record does not reveal any instructions or directives given by Sensenbaugh to Tim's crew at the job site. Nor does the record disclose any request by Tim's crew that DPL give them permission to work the line dead. See Hirschbach, 6 Ohio St.3d 206, 452 N.E.2d 326
(where a request for a more safe work zone was denied by the general contractor).
There is simply no evidence that the DPL inspector did anything more than observe the job site for contract compliance. As noted in Cafferkey,
 a general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work.
21 Ohio St.3d at 113, 488 N.E.2d at 192. This rule has been held to equally apply where a general contractor has the right, but not the duty, to observe safety violations. Bond,72 Ohio St.3d at 336-337, 650 N.E.2d 416.
Naragon finally claims an issue of fact exists as to whether DPL is liable under the principals of agency or joint venture. Naragon argues that either relationship makes DPL and HM "jointly and severally" liable for creating a "nuisance that killed [Tim] Naragon." Naragon, points to the assignment and assumption of the Fluor Daniel/HM contract by DPL, where DPL assumed the contractual duties of Fluor Daniel, as evidence of an agency or joint venture relationship.
First, there is no evidence in the record that DPL and HM were involved in a venture for "joint profit" where each party had an "equal right of control of the means employed to carry out the common purpose of the adventure." Ford v. McQue (1955), 163 Ohio St. 498,127 N.E.2d 209, paragraph 1 syllabus. Accordingly, DPL's liability cannot be based upon an joint venture theory.
Further, Fluor Daniel did not assign its contract with HM to DPL until March 11, 1994, four months after Tim suffered his fatal injury. (Appellant's Ex. 9). Nevertheless, even if DPL's assumption of Fluor Daniel's contractual obligations could be viewed as causing DPL to assume vicarious liability for any wrongful acts of HM, as discussed below, Naragon has failed to articulate any arguable claims against HM. Accordingly, the law of agency cannot impose liability on DPL based on these facts.
After viewing all the evidence most favorably to Naragon, we find there are no issues of material fact which could support a finding of liability on the part of DPL on any of the theories of liability tendered by Naragon. Bostic, 37 Ohio St.3d 144,524 N.E.2d 881.
B. Henkels McCoy, Inc.
Naragon also claims issues of material fact exist as to the liability of HM.
Under this assignment, as well as within Naragon's third assignment, she argues the trial court erred when finding no triable issue of fact as to whether HM committed a workplace intentional tort. To the extent her third assignment raises this issue, it will be discussed herein.
Tim's workplace injury occurred on November 9, 1993. Accordingly, the effect of the recently enacted law concerning workplace intentional torts, R.C. § 2745.01 which became effective on November 1, 1995, will not be discussed. See, Johnson v. BPChemicals, Inc. (November 18, 1997), Allen App. No. 1-97-32, unreported (where we found R.C. § 2745.01 unconstitutional).
In Fyffe v. Jeno's Inc.(1991), 59 Ohio St.3d 115,570 N.E.2d 1108, the Ohio Supreme Court set forth the elements of a workplace intentional tort against one's employer.
 * * * [I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Fyffe, 59 Ohio St.3d at 118, 570 N.E.2d at 1112.
After a detailed review of the record, no triable issue of fact can be found as to HM's liability under this cause of action.
Naragon argues that the dangerous condition known by HM and present when Tim worked on the power line was merely that he was working on energized power lines. However, dangerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach. Brady v.Safety-Kleen (1991), 61 Ohio St.3d 624, 576 N.E.2d 722. As noted in Brady, 61 Ohio St.3d at 631, 576 N.E.2d at 727, a workplace intentional tort injury is one suffered outside the scope of employment, beyond the "natural hazard[s]" of one's employment. Were it otherwise, any injury associated with inherently dangerous work, like energized power-line work, could subject an employer to intentional tort liability, whatever the cause. Accordingly, Naragon, must point to other evidence in the record which made Tim's work unreasonably dangerous.
Naragon mentions three dangerous conditions existing while Tim was working. First is Tim's insufficient training. Naragon claims ALBAT improperly credited Tim 5,000 hours of experience. Even if this were true, there is no evidence in the record which would support a finding that HM knew Tim lacked the experience he represented he had. Further, Naragon fails to point to any evidence which, if believed, would indicate that Tim's lack of experience actually caused his death.[5]
Naragon's argument in brief as to what HM "should have known," about Tim's experience, concedes there is no evidence HM knew Tim was not an experienced linesman. What HM "should have known" is a negligence inquiry. As noted in Fyffe, "proof beyond that required to prove negligence and beyond that to prove recklessness must be established" to present a case of employment intentional tort. Fyffe, 59 Ohio St.3d at 118,570 N.E.2d at 1112. Evidence that HM may have been negligent or even reckless in not investigating Tim's employment history and unknowingly placing him in a position of danger, is not enough to create a triable issue of fact as to HM liability for a workplace intentional tort. Id.
Naragon also claims a further dangerous condition was that another HM crew improperly grounded their job-site one mile from Tim's crew. Naragon, however, points to no evidence in the record explaining how this improper grounding caused Tim to come in contact with the energized B phase cutout. Further, even had the grounding been improper, there is nothing in the record to suggest that HM knew such a violation existed and persisted in the face of such danger, placing Tim in harm's way. Fyffe, 59 Ohio St.3d 115,570 N.E.2d 1108.
Naragon finally contends that Karl, the job-site foreman, did not ensure the insulating blanket covering the B phase cutout was properly positioned. Even if correct, there is no evidence that HM knew of this dangerous condition and nevertheless forced Tim to work close to it.Id.; see also Hirschbach, 6 Ohio St.3d 206,452 N.E.2d 326.
We find the case herein distinguishable from our decision inJones v. General Motors Corp. (May 9, 1997), Defiance App. No. 4-96-21, unreported, cited by Naragon. In Jones, a triable issue of fact was found in that workplace intentional tort case based, in part, on 213 incidents of similar injuries reported to the employer prior to the machine injuring Jones. Id. Therein, the prior incidents, together with other evidence of employer notice, were found to create an arguable issue of fact as to whether General Motor's was on notice of a dangerous workplace condition substantially certain to cause harm to Jones. Id. Herein, we are unable to find any such evidence of notice to HM in the record.
After viewing all the evidence most favorably to Naragon, we cannot find any issues of material fact as to the liability of HM for committing a workplace intentional tort against Tim. Bostic,37 Ohio At.3d 144, 524 N.E.2d 881.
C. American Line Builders Joint Apprenticeship and Training Committee
Naragon also maintains issues of material fact exist as to the liability of ALBAT. Her sole theory of ALBAT's liability for the death of her husband is negligence.
An actionable claim in negligence requires proof of facts which if believed, show "a duty, the breach of the duty, and injury resulting proximately therefrom." Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 285, 423 N.E.2d 467, 469; see also,Nice v. Marysville (1992), 82 Ohio App.3d 109, 611 N.E.2d 468. Naragon claims evidence was presented which demonstrates a triable issue exists as to whether ALBAT's breach of a duty to properly train Tim caused his death. While there appears to be disputed evidence ALBAT violated a duty to properly train Tim by crediting him 5,000 hours of experience, perhaps as a personal favor, evidence of proximate causation is missing.
Naragon's experts claim that ALBAT's negligent training of Tim caused his death. The experts, however, have failed to state in their affidavits the factual basis upon which their opinions are based.
Expert affidavits must disclose the underlying facts upon which their opinions are based regarding causation. Stamper v.Middletown Hosp. Assn. (1989), 65 Ohio App.3d 65, 69,582 N.E.2d 1040, 1043. In Stamper, an expert affidavit was found insufficient under Civ. R. 56(E) where the affidavit failed to outline any facts supporting the expert's conclusion that a defective stairway caused Stamper's fall and injury. Id. Further, Stamper noted that under Evid. R. 705, for an expert opinion to be admissible, the facts upon which his opinion is based must be disclosed. Id. As the expert in Stamper
failed to disclose any facts supporting his opinion relating to causation, his affidavit was inadmissible. Id.
Here Naragon's three experts have stated in affidavits that had Tim not been improperly credited 5,000 hours of experience from ALBAT he would not have been killed. However, the experts have identified no facts supporting their opinion that Tim's training, or lack thereof, caused him to come into contact with the B phase cutout which caused his death. Without any underlying factual basis to support these opinions, these speculations cannot be admissible in evidence. Evid. R. 705. Accordingly, as summary judgment review permits review of only admissible evidence, the experts' inadmissible conclusions as to ALBAT's liability for Tim's death cannot be considered. Civ. R. 56(E). Without evidence of causation, no issue of material fact exists as to whether ALBAT's disputed negligence caused Tim's electrocution.Stamper, 65 Ohio App.3d 65, 582 N.E.2d 1040 .
Naragon's second assignment of error is overruled.
 III.
Naragon's final assignment claims the "trial court erred by misapplying the law of intentional employment torts and employer duties."
Naragon makes several assertions under this assignment. First, Naragon once again claims that ALBAT was negligent in its training of Tim. This argument was raised above and in no way supports this assignment of error as there is no evidence in the record, which if believed, would indicate ALBAT was Tim's employer. This argument is without merit.
Naragon also reiterates her argument that the trial court erred when applying the facts in the record to the law of workplace intentional torts. The trial court properly applied the law of workplace intentional torts to the facts in the record, and as discussed above, no genuine issue of material fact exists as to HM's liability under this cause of action.
Next, Naragon claims HM was at least negligent in hiring Tim. However, negligent hiring claims are generally asserted by third parties injured by a worker whom an employer had a duty not to hire. Stephens v. A-Able Rents Co. (1995), 101 Ohio App.3d 20,654 N.E.2d 1315. Regardless, HM, as a qualifying employer in Ohio's worker compensation system is immune from suits alleging negligence raised by employees for injuries suffered during the course of employment. R.C. § 4123.74.
Naragon finally argues evidence exists which creates a triable issue as to whether DPL breached contractual and non-delegable duties owed to Tim which caused his death. This argument, however, cannot validate Naragon's assignment which asserts the trial court erred in its application of the law of "intentional employment torts and employer duties."(emphasis ours). As Naragon does not argue DPL was Tim's employer and as there is no evidence that DPL was Naragon's employer, Naragon's argument has no merit.
Naragon's third assignment of error is overruled.
Judgment Affirmed.
SHAW, P.J., and HADLEY, J., concur.
[1] "A lighting arrestor is a device used to protect power lines and equipment from surges." (Murphy Affidavit).
[2] "A cutout is a fuse holder." (Murphy Affidavit).
[3] Fluor Daniel is not a party to this action.
[4] One KV is equal to 1,000 volts of electricity.
[5] See discussion of ALBAT liability infra.